IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTIAN FERNANDO TOSCAN GOMEZ,
Petitioner,

v.

REYNA VIDALIA LOPEZ RAMIREZ
Respondent.

CIVIL ACTION
NO. 24-2196

**MEMORANDUM**

**SCHMEHL, J.** */s/JLS*                                                                                         **MAY 15, 2025**

      Petitioner Christian Fernando Toscan Gomez ("Father") filed a Verified Petition for Return of Child to Petitioner after his son was removed from Guatemala by Respondent in July of 2021. The Court held an evidentiary hearing on December 28, 2024, and permitted briefing by the parties after the date of the hearing. For the reasons set forth more fully below, the Petition is denied, and the child will not be ordered returned to Guatemala.

      Petitioner Father and Respondent Reyna Vidalia Lopez Ramirez ("Mother") are the parents of Matias Fernando Toscan Lopez (" the child") who was born on April 25, 2017, in Guatemala and is currently 8 years old. (N.T. 12/18/24 hearing at p. 5; see also birth certificate, Petitioner's Ex. B.) Father and Mother were not married but were romantically involved beginning in February of 2015. Father and Mother lived together from 2017 until 2020. (N.T. at pp 7-8.) However, the parties were not living together at the time the child was born. (*Id.*, p. 8.)

      In November of 2020, Father filed for custody of the child in Guatemala Court, claiming that Mother would not allow him to see the child, and he and Mother entered into a signed agreement for joint custody with a visitation schedule. (*Id.*, pp. 8-9.) Once the custody agreement was signed, Father testified that he would drive to Zapaca, Guatemala, where Mother was living,

and pick the child up and take him to Guatemala City, where Father's family was located. (N.T. at p. 10.) Father stated that they followed a visitation schedule from November of 2020 until June of 2021, when his father became ill with COVID. (*Id.*, pp. 10-11.) In July of 2021, Mother left Guatemala with the child and immigrated to the United States, and on July 17, 2021, Father filed a missing persons' report with the police in Guatemala for Mother and the child. (*Id.*, pp. 11, 13, 36.) The Guatemalan police in turn forwarded the report to Interpol, who issued a missing person alert. (*Id.*, p. 13; Petitioner's Exs. C-E.)

Mother testified that she left Guatemala on July 17, 2021, and that she paid someone to get her out of Guatemala, commonly referred to as a "coyote." (N.T. at p. 50.) Mother has three other children who remained in Guatemala and reside with their father. (Id., pp. 52-53.) Mother testified that she stays in touch with those children via telephone. (*Id.*, p. 53.) Due to the language barrier, it was difficult to determine Mother's immigration status with certainty, but she did have the proper paperwork to be present and employed in the United States. (*Id.*, p. 56.)

The child has attended East Penn School District since August of 2022, when he reached school age.[1] Mother testified that she began having concerns about the child's development when he was a year old, and upon receiving an assessment in the school setting, the child was diagnosed with autism spectrum disorder and enrolled in special education programming. (N.T. at pp. 39-40; Respondent's Ex. R-3, IEP, p. 8.) The child also receives occupational therapy and speech/language therapy services in the school setting. (Resp's Ex. R-3). The child currently resides in an apartment with his mother and younger brother. (N.T. at p. 44.) He speaks English

---

[1] At the evidentiary hearing, Mother testified that the child began school in Allentown in September of 2021. (N.T. at p. 38.) She referred to this school as "preparatory," then clarified that she meant preschool. (*Id.*) It is therefore my understanding that the child began preschool in Allentown in September of 2021, then began kindergarten in September of 2022 in the East Penn School District. (*Id.*)

2

as a second language but prefers to speak English at home. (N.T. at p. 44.) Also, the child is very fond of his younger brother. (*Id.*)

In December of 2023, Father physically saw Mother and the child at a location in Pennsylvania, and on December 26, 2023, he filed a Complaint for Custody in the Lehigh County Court of Common Pleas. (N.T. at pp. 14-15; Petitioner's Ex. F, custody petition.) On May 22, 2024, Father filed the Petition for Return of Child that is at issue in this case, and on July 11, 2024, Judge Zachary J. Cohen stayed the Lehigh County custody proceedings due to the filing of the instant matter. (N.T. at p. 15.)

There was conflicting testimony at the hearing regarding whether Mother suffered physical abuse from Father. Father testified that he has never threatened Mother with physical harm, and never slapped, pushed, or shoved her or had physical contact with her that was in any way aggressive. (N.T. at p. 14.) Mother testified that Father had inflicted physical abuse upon her and that the abuse continued throughout their relationship and after the relationship ended. (N.T. at p. 28.) She testified that the physical abuse occurred "weekly, every five days" during their relationship, and after the relationship ended, it would occur every two weeks when Father came to see the child. (*Id.*) Mother also alleged frequent sexual abuse throughout the relationship and continuing even after the relationship ended. (*Id.*, p. 29.) Mother testified that the child witnessed Father's abuse of her when he was a year old, continuing until he was three years old when they left Guatemala. (*Id.*, p. 31.) Mother also testified that Father verbally threatened her and told her that if she went to the police, he would kill her, and that he also threatened Mother's parents. (*Id.*, pp. 31-32.)

Mother testified that in July of 2021, Father again physically abused her and threatened that he would kill her if she filed "any reports" or if she "went anywhere." (N.T. at p. 33.) On

that occasion, Mother filed a police report which stated that on July 14, 2021, Father physically and verbally assaulted her and the child and threatened to kill them. (N.T. at p. 33, Respondent's Ex. R-1, Police report.) The police report also stated that Father demanded that Mother "sell" the child to him and that if she refused, Father would kill Mother and the child. (*Id.*) Mother stated that prior to July of 2021, she had never reported Father's abuse to the police because she was afraid of Father's threats. (N.T. at p. 35.) Mother claims that she then left Guatemala in July of 2021 with the child because she was afraid of Father. (*Id.*, pp. 35-36.) Father testified that when he met Mother, she was having problems with her current husband, and that she claimed her husband abused her. (N.T. at p. 6.) Based upon Mother's behavior and testimony at the hearing in this matter, it was apparent that Mother is in fact afraid of Father. Father came across as controlling and domineering, and I must question his motives in attempting to have the child returned to Guatemala now, after the amount of time that lapsed from July of 2021 when the child disappeared to 2024 when he filed the instant petition.

    The Court must note that due to the language barrier at the evidentiary hearing and each party's need for an interpreter, credibility was difficult to judge, as the parties' tone of voice, inflection and body language were not as apparent as they would have been if the parties had testified in English without interpreters. However, the Court notes that both Mother and Father lacked credibility at times during the evidentiary hearing. Mother was evasive regarding her immigration status and how she got to the United States, and Father was vague regarding what efforts, if any, he took to locate his child between July of 2021 and December of 2023.

    **1. The Hague Convention on Civil Aspects of International Child Abduction**

    The Hague Convention is a multilateral treaty on parental kidnapping to which the United States and Guatemala are members. The International Child Abduction Remedies Act, 22 U.S.C.

§§ 9001 *et seq.*, implements the Hague Convention and entitles a person whose child has been wrongfully removed to the United States to petition a federal court to order the child returned. See *Yang v. Tsui,* 499 F.3d 259, 270 (3d Cir. 2007). The Convention has two primary objectives: "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Karpenko v. Leendertz*, 619 F.3d 259, 263 (3d Cir. 2010). To secure the return of an abducted child under the Hague Convention, a petitioner must prove by a preponderance of the evidence that the "child has been wrongfully removed" within the meaning of the Convention. 22 U.S.C. § 9003(e)(1). Determining whether removal was wrongful generally requires a court to address the following four issues, as articulated by the Third Circuit: "(1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention." *Karpenko*, 619 F.3d at 263 (quoting *Yang v. Tsui*, 499 F.3d at 270–71.) Upon a showing of wrongful removal, the burden shifts to the wrongful remover to establish one of several affirmative defenses. *Monzon v. De La Roca*, 910 F.3d 92, 97 (3d Cir. 2018); 22 U.S.C. § 9003(e)(2)(A) and (B).

Relevant here, I "may refrain from ordering the return of a wrongfully removed child if the Respondent establishes, by a preponderance of the evidence . . . that the proceeding was commenced more than one year after removal of the [child] and that [child] ha[s] become 'well-settled' in [his] new environment." *Bejarno v. Jiminez*, 2020 WL 4188212, at *6 (D.N.J. July 21, 2020) (citing *Monzon*, 2016 WL 1337261, at *9 (internal citations omitted).

**2. Wrongful Removal**

As noted above, I first must determine if the child was wrongfully removed. To do that, I must determine when the removal took place, the child's "habitual residence" at the time of removal, whether removal of the child breached Father's custody rights and whether Father was exercising his custody rights when the child was removed. A child's "habitual residence" is the place "where he or she has been physically present for an amount of time sufficient for acclimatization, and which has a 'degree of settled purpose' from the child's perspective." *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995). In this matter, there is no real dispute that the child's habitual residence prior to removal was Guatemala, as he was born in Guatemala (Ex. B, the child's Guatemalan birth certificate) and lived there his entire life prior to July of 2021, the date of the removal.

I next must determine whether removal breached Father's custody rights and whether he was exercising his custody rights in July of 2021. The testimony from the evidentiary hearing clearly establishes that Father was exercising his custody rights at the time of removal, as the parties had entered into an agreement for joint custody with a visitation schedule in November of 2020. By removing the child from Guatemala, Mother breached Father's custody rights pursuant to the agreement entered in November of 2020. Accordingly, I find that Father has shown that Mother wrongfully removed the child from Guatemala, his country of habitual residence. If "a petitioner demonstrates wrongful removal or retention, the burden shifts to the respondent to prove an affirmative against the return of the child to the country of habitual residence." *Bejarno v. Jiminez*, 2020 WL 4188212 at *4 (quoting *Karkkainen v. Kovalchuk*, 445 F.3d 280, 289 (3d Cir. 2006)). Therefore, Father has met his burden of proof, and I must order the return of the

child to Guatemala unless Mother can establish one of the affirmative defenses by clear and convincing evidence.

### 3. Well-Settled Defense

Mother argues that the "well-settled" affirmative defense applies in this matter, as the child is well-settled in the United States and the petition to return him to Guatemala was filed more than one year after his removal. First, Father's petition to return the child to Guatemala was clearly filed well more than a year after his removal, as the child was removed in July of 2021, and Father filed the instant petition in May of 2024. Father attempts to circumvent the one-year rule by arguing that he filed a custody complaint in Lehigh County within one year of **discovering** his son was in Pennsylvania, but this argument must fail for two reasons. First, the Convention states that the petition must be filed within one year of the **removal**, not one year of the discovery of the child's location.[2]

Second, the Convention states that the "proceedings [must be] 'commenced' in the 'judicial or administrative authority of the Contracting State where the child is. . .'" *Monzon*, 910 F.3d at 96. ICARA defines "commencement of proceedings" as used in Article 12 of the Convention as "the filing of a petition in accordance with [22 U.S.C. § 9003(b)]." *Id*. at 98. Section 9003(b) states that a person seeking to "initiate judicial proceedings under the Convention for the return of a child . . . may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action, and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." 22 U.S.C. § 9003(b). The proceedings in this case were "commenced" on May

---

[2] Although Father does not explicitly argue that the Petition in the instant matter was filed in May of 2024, which was within one year of Father's discovery of the child in Allentown, Pennsylvania, in December of 2023, that argument also would fail. The Petition for return of the child to Guatemala must be filed in this Court within one year of the child's removal, or by July of 2022.

22, 2024, when Father filed his petition in this Court, nearly 3 years after the child's removal. The fact that Father filed a custody complaint in the Lehigh County Court of Common Pleas on December 26, 2023, is irrelevant, both because it is not a petition filed in the Court with jurisdiction over this matter and because it is still well over 2 years after the child was wrongfully removed. There is no question that Father did not meet the one-year deadline. Therefore, I must determine whether the child is now well settled in the United States.

In *Monzon*, the Third Circuit laid out the factors that courts typically consider in making this type of determination. These factors are: "1) the age of the child; 2) the stability of the child's new residence; 3) whether the child attends school . . . consistently; 4) whether the child attends church regularly [or participates in other extracurricular or community activities]; 5) the stability of the parent's employment or other means of support; 6) whether the child has friends and relatives in the area; 7) to what extent the child has maintained ties to Guatemala; 8) the level of parental involvement in the child's life; 9) active measures to conceal the child's whereabouts . . . ; and 10) the immigration status of the child and parent." *Monzon*, 910 F.3d at 105-106 n. 88.

As to the first factor, the child is currently 8 years old. He has been in the United States for almost four years now. "[C]ourts generally conclude that repatriation of an infant is less burdensome on the child than repatriating an older child, who is more likely to have memories of the United States and more ties to the country." *Monzon*, 2016 WL 1337261, at *13 (quoting *Taveras v. Morales*, 22 F.Supp.3d 219, 236 (S.D.N.Y. 2014), *aff'd*, 604 F.App'x 55 (2d Cir. 2015)). At 8 years old, the child is old enough to form memories of and ties to the United States. Further, having been in the U.S. for over 4 years, he certainly will have formed said memories and ties. This factor weighs heavily in favor of Mother.

Regarding the second factor, the child has resided in the Allentown, Pennsylvania area for the entire time that he has been in the United States. Mother and the child have resided at three different locations since arriving in Pennsylvania, but they have all been in the same general area of Allentown, Pennsylvania. This second factor also weighs in favor of Mother.

As to the third factor, the child has attended the same school system since he reached school age. He had been a student in the East Penn School District for over two years as of the date of the hearing. Importantly, upon starting school, the child was diagnosed with autism spectrum disorder. He receives special education services at school, including occupational therapy, and speech and language therapy, and has a personal aide to assist him throughout the school day. This is all set forth in the child's IEP. (Resp's Ex. R-3.) There is little doubt that the child would not receive this level of services and support if he returned to Guatemala. This third factor weighs heavily in favor of Mother.

There was no testimony regarding the child's attendance at church or extracurricular or community activities to address the fourth factor, nor was there any testimony regarding the stability of Mother's employment to address the fifth factor.[3] As to the sixth factor, the child resides with his mother and younger brother, with whom he is very close. This factor weighs minimally in favor of Mother.

Regarding the seventh factor, there is no evidence that the child has maintained any ties whatsoever with Guatemala since July of 2021. As to the eighth factor, level of parental involvement, Mother is home every day to get the child off the school bus and appears to be an involved and concerned parent. Both of these factors weigh in Mother's favor.

---

[3] Mother's trial brief states that the child attends church regularly with his family, and that Mother has had "mostly consistent employment" since arriving in the U.S., currently working locally at a rehabilitation center. (Docket No. 14, p. 13.) However, no such evidence was introduced at the hearing.

9

Regarding the ninth factor, there is no dispute that Mother fled Guatemala with the child and did nothing to advise Father of the child's location. From this, it can be assumed that Mother was making some effort to conceal the child's location. Therefore, this factor weighs in favor of Father.

Lastly, as to the tenth factor, there is some uncertainty surrounding the immigration status of Mother and the child. There was testimony that Mother does have a permit to work in the United States, and that she is seeking asylum, but the record was underdeveloped in this regard. Accordingly, I find this factor to be neutral.

After careful consideration of all ten of the relevant factors, I find that Mother has met her burden and proven by a preponderance of the evidence that the child is settled in the United States.[4] It is also the Court's view that the child remaining where he is presently located and receiving services is clearly in his "best interests." Accordingly, Father's Petition for return of the child to Guatemala will be denied.

---

[4] Although Mother contends that the affirmative defense of "grave risk" is also applicable in this matter, I do not need to analyze its applicability, as I have found that Mother has met her burden regarding the "well-settled" defense.